NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 09a0503n.06

No. 07-6374

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

KAREN BLOOM,                               )
                                           )
          Plaintiff-Appellee,              )
                                           )
                 v.                        )     ON APPEAL FROM THE UNITED
                                           )     STATES DISTRICT COURT FOR
HARTFORD LIFE AND ACCIDENT                 )     THE WESTERN DISTRICT OF
INSURANCE COMPANY,                         )     KENTUCKY
                                           )
          Defendant-Appellant.            )

**FILED**
**Jul 21, 2009**
LEONARD GREEN, Clerk

BEFORE:  MARTIN, SUHRHEINRICH, and WHITE, Circuit Judges.

**WHITE, CIRCUIT JUDGE.**  Plaintiff, Karen Bloom, filed an action against the defendant, Hartford Life and Accident Insurance Company ("Hartford"), alleging that its decision to deny her long-term disability benefits was in violation of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.* ("ERISA").  The district court granted summary judgment for Bloom, and ordered Hartford to award benefits.  Hartford appealed.  We affirm the district court's decision that Hartford's denial of benefits was arbitrary and capricious, but remand to the administrative process to allow a determination of date of disability and amount of benefits owed.

I.

A.        **Bloom's Employment with Rehabilitation Associates**

Karen Bloom is a medical doctor, specializing in physical medicine and rehabilitation, and a partner at Rehabilitation Associates.  In 1999, Bloom was diagnosed with Multiple Sclerosis (MS).  Beginning in 2002, Bloom shifted her work from a largely inpatient practice to one where she provided mostly outpatient services.  Bloom contends that the shift from inpatient to outpatient was

1

a business decision, and unrelated to her MS diagnosis. Hartford interpreted this shift to be due to her MS, and points to this shift as evidence that Bloom became disabled in December 2002.

Bloom concedes that she did not work her normal hours in December of 2002, and for much of 2003. She provides several reasons, unrelated to her MS diagnosis, for her reduced hours during this time period. In early December 2002, she prepared to testify as an expert witness in a trial, and in order to be available for court, cleared her schedule with Rehabilitation Associates for the first week of December. The case settled before trial, and Bloom went to the office and caught up on paper work, but did not see patients that week.

Bloom took two vacations during this time period, from December 18 to January 6, 2003, and a week during early February. On February 11, after her return from vacation, she slipped and fractured her ankle and was unable to go into work until the end of April. Shortly after Bloom returned to work, she re-broke her ankle on May 14. In the middle of June, Bloom again returned to work, but she was unable to return to all her normal duties until the middle of October, when her brace was finally removed.

In the winter of 2004, Bloom was unable to continue working full-time at Rehabilitation Associates due to her MS. Bloom claims that "this was the first time I ever missed a day of work for my MS." She began to work part time, seeing patients for a half day once a week and doing paper work from home.

### B.      The Long-Term Disability Policy

In October 2002, Rehabilitation Associates purchased a group insurance plan, which included a long-term disability policy administered by Hartford. The policy was provided to "active, full-time employees" working at least 30 hours per week. The policy further defined a full-time employee as:

  **Active Full-Time Employee** means that you must be:
1.  working for your Employer on a full-time basis and paid regular earnings;
2.  performing your normal duties, if it is a scheduled work day;
3.  working at least [30 hours per week]; and
4.  working at your normal place of employment or at some other location where your Employer's business requires you to travel.

The policy had a pre-existing condition exclusion, which stated:

> This plan will not cover any Disability which begins during the first 365 days after your Effective Date of Insurance which is caused by, or contributed to by, a Pre-Existing Condition, unless you have had no Treatment for a Pre-Existing Condition during a 180 day period following your Effective Date of Insurance.

In addition, the policy contained a clause which gave discretion to Hartford to determine eligibility for benefits. The policy stated:

> **Interpretation of Plan Terms and Conditions**
> We have full discretion and authority to determine Eligibility for benefits and to construe and interpret all terms and provisions of this plan.

### C. Bloom's application for benefits

In March 2004, Bloom filed a claim for long-term disability benefits under Hartford's policy. On her claim form, she stated that she was diagnosed with MS in November 1999. An "Employer's Statement," completed by Lynn Kissel, the practice administrator at Rehabilitation Associates, stated that Bloom's regularly scheduled work week was 32 hours per week, that Bloom was "still working," but that the most recent day she worked, she only worked "6-7" hours. Kissel indicated that Bloom's salary was $10,000 per month. Kissel attached a copy of Bloom's 2002 W-2, which indicated that she earned $145,439.84 that year.

Bloom's application also identified Dr. Roy Meckler as the neurologist who had been treating her MS since she was diagnosed. Dr. Meckler completed an "Attending Physician's Statement of Disability" (APS) form that was attached to Bloom's application. Dr. Meckler indicated that Bloom

had a primary diagnosis of MS, and that she suffered from "intractable fatigue, impaired gait & mobility, ataxia, weakness in extremities." Dr. Meckler stated that "all sustained activities [were] limited by weakness and intractable fatigue," and that Bloom had "blurred vision" and "intermittent displasia." The form included a line that stated: "Date patient became unable to work due to this impairment? Month _____ Day _____ Year _____." Dr. Meckler left this portion of the form blank.

After receiving Bloom's application, Hartford sent Dr. Rogers, one of Bloom's doctors, an APS to complete. On the APS, Dr. Rogers indicated that he had been treating Bloom since 1999, that he saw her every six months, and that she had a diagnosis of MS, Crohn's disease, hyperlipidemia, migraines, platelet storage pool disorder, duodenitis, osteopenia, possible steroid-induced myopathy, hypertension, pathological ankle fractures, and vertigo. Dr. Rogers listed Bloom's physical limitations as "primarily generalized weakness, balance problems, poor endurance all related to MS and its treatment." In response to the question regarding the date she became "unable to work," Dr. Rogers wrote "January 1, 2002."

Aaron Gouveia, a Hartford examiner in Sacramento, California, conducted two telephone interviews with Bloom in 2004. Gouveia's notes from the conversation indicate that Bloom told him that in 2002, her monthly salary decreased from $13,000 to $10,000 per month, and that she earned only $40,000 in 2003, and nothing to date in 2004, because she is "a production based physician." She explained that her salary decrease was related to her shift to outpatient services, and that she "chose not to take her salary for almost all of 2003 as to try to break even and not have to owe the group back any income." She also informed him that she continued to work approximately 36 hours per week until her MS relapse in the winter of 2004.

In March of 2004, Hartford requested more information from Rehabilitation Associates regarding Bloom's 2003 work schedule, and Lynn Kissel sent a letter to Hartford stating:

> Dr. Bloom has gradually given up duties at work as she has become more disabled. This year she resigned her position as Residency Program Director (a substantial portion of her job). . . . Unfortunately, February 11, 2003 Dr. Bloom fell and fractured her left ankle. She was not able to work regular hours or care for patients for weeks afterward. She did work from home performing chart reviews. . . . Dr. Bloom does not have "on-call" responsibilities. Dr. Bloom has gradually changed her work responsibilities over the years since she has been diagnosed with Multiple Sclerosis. She has not formally stopped work. She has had to take several days off for sick leave. . . . She does not perform hospital rounds or have 'on-call' responsibilities. Clinic hours have been further cut back. Her Employment Contract is being renegotiated due to her part-time status effective 1/1/04.

Kissel also provided an outline of Bloom's approximate work schedule by month, which confirmed that during 2002, Bloom had a significant inpatient practice, but beginning in December 2002 and continuing through 2004, Bloom shifted her practice to outpatient services.

On September 21, 2004, Hartford denied Bloom's claim, stating that it had "determined that the Pre-Existing Condition provision contained in the policy applies to your claim." Hartford further stated:

> The information provided by your Employer shows that you reduced your medical practice effective 12/1/02. We have reviewed the information contained in your claim file and it has been determined that the date you became Disabled under our plan is 12/1/02. This date was determined by reviewing your work schedule provided by your Employer that noted your weekly work hours; not including you attending grand rounds the 2nd and 4th Fridays of each month, faculty meeting 1st Friday of each month, and meeting with the residents totaled 30.5 hours for the period of 2/1/02-11/30/02 and 18.5 hours for the period of 12/1/02-2/11/03.
> . . . .
> [I]t is our determination that your condition is Pre-existing under the above policy and we will not be able to provide you with benefits.

> In addition, based on the information contained in your claim file it also appears that you were no longer considered an Active-Full-time Employee under the plan effective 12/1/02 as you were no longer working at least the required number of hours per week as shown on your Certificate of Validation Form.

On March 8, 2005, Bloom's attorney, Michael Hance, sent a letter to Hartford appealing its decision. The letter conceded that Bloom's MS was a preexisting condition under the policy, but argued that she did not become disabled until after the expiration of the 365-day period.[1] The appeal letter explained that the "claims adjuster incorrectly assumed that Dr. Bloom's billable hours were the only indication of her average weekly work hours." Bloom acknowledged that her billable hours had decreased in the fall of 2002, but stated that the decrease was due to a "business judgment" at Rehabilitation Associates and not to her MS.

In support of her appeal, Bloom attached (1) a sworn statement from Lynn Kissel at Rehabilitation Associates; (2) her own sworn statement; (3) a letter from Dr. Rogers; and (4) her monthly billable summaries from Rehabilitation Associates.

In her sworn statement, Kissel stated that the outline of Bloom's work schedule that she provided to Hartford included only billable hours. Kissel stated that in addition to her billable work, Bloom also conducted "phone calls, discussions with doctors . . . research, review of records, signing orders, signing therapy orders, reviewing medical records of cases in litigation, preparing lectures." Kissel also stated that between the time that Bloom healed from her first ankle injury and when she refractured her ankle, "she had gotten back up to where she was here most of the time." After her

---

[1]The policy's effective date was October 2, 2002, and thus, the 365-day period expired on October 2, 2003. Bloom claims that she did not become disabled under the policy until the winter of 2004.

ankle healed the second time, in mid-to-late 2003, Bloom worked the same amount that she had in the fall of 2002, "without the inpatient service." Instead of inpatient service, Bloom tried to increase the litigation support and consulting work that she did for attorneys and insurance companies.

In her sworn statement, Bloom stated that the change in her practice from inpatient to outpatient services was a business decision, and unrelated to her MS. She explained that Rehabilitation Associates "had hired a number of new physicians . . . [that] needed . . . jobs, they needed patients, so I said I would gradually change over my inpatient service to some of those physicians – actually, I think two physicians took over my inpatient service. So gradually over time I stopped seeing as many inpatient consults." Bloom also said that by December of 2002, she was trying to "spend more time on the residency program as well as grow my expert witness practice. Also, I wanted to increase the amount of chart reviews I was doing, which I did and spend more time in research." She admitted that her salary changed during this time, and claimed that change was unrelated to her MS, but a business practice, and that other partners had similar changes in their salaries. After her ankle healed and her brace was removed, Bloom contends that she was "back up to my regular hours" by October 2003. Finally, Bloom discussed the difference between billable and non-billable hours, and explained that "[f]or every little billable hour I probably had at least a non-billable hour" of work. Bloom provided examples of non-billable hours:

> [P]hone calls to patients, signatures on orders, discussions with other doctors about a patient or looking up information about a patient, talking to insurance companies, talking to family members, family conferences. We had something called chart rounds, which would take more than half a day. We'd go over each patient, but the insurance company wouldn't pay us for that but by law we have to do it.

Bloom stated that for 2002 and 2003 she was considered a full-time partner, participated in partnership meetings, carried a full load as a partner, and received full-time benefits, including a 401K.

The letter from Dr. Rogers that Bloom sent to Hartford with her appeal stated that "a mistake was made on a previous disability form filled out in my office, indicating that [Bloom] was completely disabled as of January 1, 2002. That assumption is incorrect. Hopefully this information will rectify that problem. Please contact the office for questions."

The last document included with Bloom's appeal was a monthly summary of Bloom's billable hours from September 2002 to December 2003.[2] The document contained a chart for each month, and at the bottom of each chart was a total number of hours for the month, with an asterisk next to the number indicating that the total "does not include . . . non billable hours." Bloom's total billable hours varied widely:

| | | | |
|---|---|---|---|
| September 2002: | 100 | May 2003: | 87 |
| October 2002: | 119.75 | June 2003: | 65 |
| November 2002: | 69.75 | July 2003: | 46.5 |
| December 2002: | 55.25 | August 2003: | 78.75 |
| January 2003: | 102.75 | September 2003: | 54.25 |
| February 2003: | 35.74 | October 2003: | 80 |
| March 2003: | 65 | November 2003: | 38.08 |
| April 2003: | 61 | December 2003: | 23.28 |

Dr. Robert Marks, a medical doctor hired by Hartford, conducted an independent medical review of Dr. Bloom's medical records, and provided Hartford with a summary of the records. In his summary, Marks included information about a November 30, 2003 hospitalization for chest pain,

---

[2] Hartford argues that the monthly summaries "are unauthenticated and their source was not identified." After receiving the summaries, however, Hartford did not request further information or authentication from Bloom or Rehabilitation Associates. Instead, it chose to disregard them.

where Bloom suffered from "Alzheimer's type dementia." This information apparently comes from a medical record incorrectly supplied by Dr. Rogers regarding one of his other patients. No other medical records indicate that Bloom had Alzheimer's type dementia, and the document was clearly labeled with another patient's name.

Dr. Marks also spoke with Dr. Meckler, Bloom's neurologist, but the conversation (as recorded in Dr. Marks's notes) provides no support for a December 2002 date of disability.[3]

Dr. Marks's report provides the following discussion:

> The available documentation will permit the dating of the claimant's neurological condition to 1999 by history. However, the notes only go back to early 2003. At that time there was a fall, and the claimant sustained fractures of the lower limb and hand. She was placed in a short leg cast and on non-weight bearing status. It is not clear as to the nature of the fall, but this could have been related to a disturbance in balance, and perhaps vision. . . . There are repeated MRI scans of the brain which do indicate that there are abnormalities, and possibility with

---

[3] Dr. Marks's notes state:

> Dr. Meckler called and stated that he knew the claimant for some years and felt that she is motivated to work and does not exaggerate her symptoms. He emphasized that there were two important illnesses affecting the claimant's condition, multiple sclerosis, and Crohn's Disease. When asked for objective findings regarding functionality, Dr. Meckler stated that the claimant has a balance problem which has caused a number of falls. Vision is functional, and ambulation is slightly unsteady, and cane is utilized. The claimant can use her upper limbs, but there is some difficulty with fine motor control. Of greatest concern are cognitive difficulties. Dr. Meckler states that the claimant is no longer able to be efficient and multitask. There also may be some memory deterioration. When asked if these deficits have ever been documented with testing, [Dr. Meckler] replied that this had not been done and his report is based on his observations and the complaints of Dr. Bloom. Dr. Meckler concluded that even during the time of office visits with Dr. Bloom, that she appears worn out, and even more so by the end of the visit. Dr. Meckler did not know if the claimant was still working, but had concerns because of the fatigue and possible cognitive difficulties. Dr. Meckler stated that he did not want to provide a time course for the deterioration of the claimant's functionality.

some progression of the lesion number, although the claimant had been on medication.

On 11/30/03 to 12/2/03 there was an admission to Jewish Hospital by Matthew Rogers, MD. The reason for admission was chest pain, but dementia of the Alzheimer's type is mentioned. The reviewer could not find a detailed evaluation of cognitive functions. It is not certain as to the nature of the problem (medication, MS, psychiatric?).

As mentioned above, Dr. Bloom was not hospitalized on November 30, 2003, and the medical record that Dr. Marks reviewed was about a different patient.

Finally, Dr. Marks provides the following conclusion:

Based on the available documentation and teleconference with [Dr. Meckler], it is the reviewer's opinion that there have been neurological problems that impacted on function at least as far back as early 2003. However, the claimant was able to function and perform at some level to permit continuing working, except for those times where there was injury (fall and fractures, and medical care, etc.). The presence of two significant disorders, both of which can be associated with fatigue, in addition to the observations of [Dr. Meckler], convince the reviewer that fatigue is a symptom of paramount important in this case. The note of 3/15/0[4] states "increasing fatigue of one week duration followed by impaired gait with bilateral lower extremity weakness." Also mentions some memory and cognitive changes. . . . does strongly indicate that functional ability was significantly impacted by this date. At this point one could question the ability of the claimant to operate as a physician. It should be stated that there are no reports of cognitive testing. . . . By 3/15/0[4] the combined deficits in cognition, gait, and endurance make fulltime work improbable. It may be that any work as a physician is imprudent.

On July 8, 2005, Hartford denied Bloom's appeal, concluding that "[t]he records received support a date of disability of 12/1/02." In this letter, Hartford repeated the same incorrect information about a hospitalization in November 2003 that was provided in Dr. Marks's summary. Hartford also acknowledged receipt of Dr. Rogers' letter explaining that the January 1, 2002 date of disability that he provided on an APS form was incorrect, but stated that Dr. Rogers had "not

present[ed] an argument against the establishment of 12/1/02 as the date of Disability." Hartford

concluded that Bloom was not entitled to benefits due to the preexisting condition clause.

On August 22, 2005, Bloom filed a complaint against Hartford in a state court, alleging

breach of contract, fraud, and unfair claims settlement practices. On September 12, 2005, Hartford

removed the case to federal district court, on the ground that Bloom's claim was governed by

ERISA. On February 23, 2007, the district court granted Hartford's motion to dismiss Bloom's state

law claims, and held that they were preempted by ERISA.

Bloom filed an "Opening Brief in Support of ERISA benefits," which the district court

treated as a motion for summary judgment. On July 3, 2007, the district court granted Bloom's

motion on the ground that Hartford's decision to deny benefits was "arbitrary and capricious," and

ordered Hartford to award Bloom "the appropriate long-term disability benefits." Hartford filed a

motion to amend the order, requesting that the court remand Bloom's claim to the administrative

process. The district court denied Hartford's request on October 15, 2007. This timely appeal

followed.

## II.

"This court reviews the district court's grant of summary judgment in an action involving an

ERISA claim *de novo*," applying the same standard as the district court. *Williams v. Int'l Paper Co.*,

227 F.3d 706, 710 (6th Cir. 2000).

A denial of benefits challenged under 29 U.S.C. § 1132(a)(1)(B) is to be reviewed under a

*de novo* standard unless the benefit plan gives the administrator discretionary authority to determine

eligibility. *Id* at 710-11. Here, the parties concede that the policy's "interpretation of plan terms and

conditions," located at page 29 of the policy, gives Hartford discretion to determine eligibility. Thus,

"a court reviewing the plan administrator's actions should apply the arbitrary and capricious standard of review." *Id*. at 711.

The arbitrary and capricious standard of review is the least demanding form of judicial review of administrative action. *Id*. at 712. "When applying the arbitrary and capricious standard, the Court must decide whether the plan administrator's decision was 'rational in light of the plan's provisions.'" *Id.* at 712 (quoting *Daniel v. Eaton Corp*., 839 F.2d 263, 267 (6th Cir. 1988)). "When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989). Although review pursuant to the arbitrary or capricious standard is extremely deferential, "[i]t is not, however, without some teeth. Deferential review is not no review, and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co*., 347 F.3d 161, 172 (6th Cir. 2003) (citation and internal quotations marks omitted).

Based on Bloom's billable work hours, Hartford denied benefits to Bloom for two reasons: (1) it found that she became disabled on December 1, 2002, and (2) it found that she did not qualify as an active, full-time employee. Thus, the crux of the dispute between the parties is whether Hartford's reliance on Bloom's billable work hours resulted in an unreasoned, unsupported decision.

The district court found that Hartford's decision finding Bloom disabled on December 1, 2002 was arbitrary and capricious because Hartford "relie[d] overwhelmingly on *circumstantial* evidence of Bloom's medical condition – work records and salary reports. Hartford [did] not even rely on medical examinations conducted between December 1, 2002 and February 11, 2003 – the very period in which Hartford determined that Bloom had become disabled." When Hartford did have medical evidence, such as Dr. Marks's report, it drew an unreasonable conclusion from the

report. Dr. Marks concluded that "Dr. Bloom had neurological problems that impacted on function at least as far back as early 2003, however she was able to function and perform at some level to permit continued working except for those times where there was an injury." Nothing in Dr. Marks's report indicates that Bloom was disabled in December 2002, but Hartford uses his report to conclude "records received support a date of disability of 12/1/02."

The only evidence that Hartford received dated earlier than 2003 was information from Rehabilitation Associates regarding Bloom's billable work hours, information which was inadequate to support an inference that she was disabled by her MS on December 1, 2002. Thus, Hartford's determination that Bloom became disabled on December 1, 2002, was arbitrary and capricious.

Hartford's initial denial of benefits letter also states that Bloom did not qualify as an active, full-time employee. In its denial of Bloom's appeal in July 2005, Hartford discusses only Bloom's date of disability, but states "please refer to our letter dated 9/21/2004 for the policy provisions relevant to our determination and the basis upon which Dr. Bloom's claim was denied."

It is undisputed that Bloom's weekly working hours varied from December 1, 2002 to October 1, 2003, and that there were several stretches during this time period where she did not work at all — she was scheduled to appear in a trial in December 2002, she took several vacations, and she sustained two ankle fractures in 2003. In addition, it is undisputed that her salary declined significantly in 2003. Bloom asserts that the decrease was due to business decisions at Rehabilitation Associates, while Hartford claims it was due to her MS.

In her appeal, Bloom provided information explaining her hours, and made an important distinction between billable and non-billable hours. There is no indication in the record that Hartford considered this information. In its brief before this court, Hartford refers to the sworn statements

that Bloom provided with her appeal as "less than convincing" and "self-serving," but those reasons do not explain its complete failure to conduct an investigation into the billable hours distinction that Bloom provided. Finally, Hartford ignored the evidence that Rehabilitation Associates treated Bloom as a full-time employee by providing her with a 401K, and privileges as a full-time partner. Its conclusion that Bloom was not a full-time employee, and thus not covered under the policy, was arbitrary and capricious.

## III.

Having concluded that the district court was correct in its determination that Hartford's denial of benefits was arbitrary and capricious, the only question left for this court is whether to remand to the administrative process. This court has held that it is appropriate to grant disability benefits without remanding the case where there are no factual determinations to be made. *Williams*, 227 F.3d at 715. However, "remand is the appropriate remedy in some cases," such as where adequate findings of fact were not made below, or where "it was unclear that the claim should be granted." *Id.*.

Hartford argues that if this court finds its denial of benefits was arbitrary and capricious, it should nonetheless remand the proceeding to the administrative process because it has not yet been determined that Bloom was disabled in the winter of 2004, as she claims. Bloom responds by pointing out that Hartford's own expert, Dr. Marks, stated that by March 2004, "the combined deficits in cognition, gait, and endurance make fulltime work improbable. It may be that any work as a physician is imprudent."[4] In addition, the information provided by her neurologist, Dr. Meckler,

---

[4]Admittedly, it is unclear what weight, if any, Dr. Marks placed on the dementia that he thought Bloom displayed during a hospitalization in November 2003.

and summarized by Dr. Marks, demonstrates that it was not possible for Bloom to continue working as a physician full-time past 2004.

This court has reviewed the district court's opinion, and as explained above, we agree that Hartford's denial of benefits was arbitrary and capricious. However, we find that the district court erred when it failed to remand Bloom's claim to the administrative process, as there has not yet been a determination made regarding the date of her disability and the amount of benefits owed. Accordingly, we must remand to allow a determination of Bloom's date of disability. Hartford has argued that Bloom was not covered by the policy as she was not a full-time employee; we find this determination unsupported by the evidence, and on remand, Hartford may not reopen the coverage issue. The only issues for consideration on remand are date of disability and benefits owed.